MILLER, Judge.
The trial court held that plaintiff was disabled at the time of the trial and this disability resulted from the accident. Plaintiff Levier was awarded $12,000 for his disability, past and present, including pain and suffering, together with $4,335.61 in medical expenses incurred in his treatment.
Defendant concedes liability (his insured rearended the vehicle in which plaintiff was a passenger) but appealed contending that plaintiff failed to prove that his psycho-neurotic reaction, depressive reaction, resulted from the June 10, 1965 automobile accident, and therefore the award was excessive.
Plaintiff entered a separate appeal requesting an increase in the award of damages.
Since plaintiff’s present psychiatric disability is conceded by all three psychiatrists, the essential issue raised by defendant appellant is whether or not the disability was caused by the June 10, 1965 accident.
Plaintiff’s original treating physicians were Doctors D. J. deBlanc and Charles N. Washington, both general practitioners of Opelousas. Plaintiff’s injuries were described as a severe contusion of the right shoulder and the right clavicle. Pieces of broken glass were found in his scalp. He had a cerebral concussion; a large contused area in the occipital area; myofascial ligamentous sprain of the neck and a contused area on his chest. According to the history, the contused area in the occipital area resulted from a heavy tool box striking plaintiff on the back of the head during the accident. X-rays were negative..
On the July 16, 1965 examination, plaintiff had severe headaches and “there was radiation of pain in the right arm * * * from the cervical region.”
Plaintiff was actively treated by Dr. deBlanc for his physical complaints until November 11, 1965, when Dr. deBlanc discharged him from active treatment. Up to that time, Dr. deBlanc was of the opinion that plaintiff could not return to work because of his physical disability. Even as of November 11, 1965, Dr. deBlanc did not think plaintiff could return to work, but he did think that at some time in the future, plaintiff would be able to return to work.
Dr. Washington treated plaintiff on occasions when Dr. deBlanc was otherwise occupied. It was his opinion on November 11, 1965 that plaintiff could not return to work. As of January 25, 1966, Dr. Washington noted that plaintiff continued to have back pain, headaches, and numbness in the right leg. He then referred plaintiff to an orthopedic surgeon for evaluation.
Dr. George Schneider, orthopedic surgeon of Lake Charles, and Dr. Luke Bordelon, orthopedic surgeon of Opelousas, both agreed that there was no physical basis for plaintiff’s complaints.
Dr. Washington examined plaintiff on April 19,1966 and made the following memorandum : “The patient returned today continuing to complain of pain in his back and headaches. Physical examination is essentially negative. It is my impression that the patient at this point is recovered from the injuries sustained in this accident, but continues to have the pain on the basis of conversion reaction and is still disabled at this time. I recommend that the patient be evaluated by a psychiatrist and the therapy which he feels indicated be given. * * * ” That was the last time that Dr. Washington saw plaintiff as a patient.
Plaintiff was seen by Dr. John A. Fisher, psychiatrist of Lafayette on May 2, 1966. His complaints were mild dizziness and low back pain. At Dr. Fisher’s suggestion, plaintiff sought light work. From July 8, 1966 until February 24, 1967, plaintiff did farm labor. Dr. Fisher did not believe that plaintiff could return to his original employment at that time. Plaintiff’s farm employer had to shift him from one job to another which is in keeping with a finding that he could not then return to his construction trade. Even though plaintiff was *227 doing some farm work and was improving, Dr. Fisher diagnosed “a mixed psychoneurosis with symptoms of both anxiety and depression, and perhaps some conversion symptoms.” In Dr. Fisher’s opinion, this condition was “in all probability” caused by the accident. Plaintiff was placed on antianxiety type medication, and was kept on these medications throughout the seven visits, the last of which occurred on November 18, 1966. Plaintiff was not discharged at that time, but Dr. Fisher then retired from private practice to take a government position. His practice was taken over by Dr. David Regan in January of 1967.
Dr. Regan first saw plaintiff on January 17, 1967 when plaintiff returned for a previously scheduled appointment. Dr. Regan referred to Dr. Fisher’s notes, took the patient’s history and examined plaintiff. Plaintiff complained of dizziness and pain and trembling in the neck. He was lethargic, and unable to work. Plaintiff was diagnosed as “psychoneurotic reaction, depressive reaction.” Vol. Ill, p. 84. Plaintiff’s condition deteriorated and on February 20, 1967, plaintiff was hospitalized. He was then lethargic, having memory loss, incoherent in his speech, and displayed suicidal tendencies. Plaintiff was given six electroshock treatments while hospitalized, and was released on March 3, 1967. On March 14, 1967, plaintiff started a series of 15 additional electroshock treatments as an outpatient, which terminated on May 5, 1967.
Plaintiff was still apathetic and suffering from a loss of memory. Dr. Regan described him as “severely depressed and severely impaired in his functioning, and totally disabled.”
The trial of the case was not completed in the first two days allotted for it. During the interim period, Dr. Regan continued to treat plaintiff. On January 3, 1968, plaintiff’s medication was increased and additional electroshock treatments were scheduled. As of February 14, 1968, plaintiff had received eight more electroshock treatments which resulted in some improvement, but his memory remained poor.
At the final day of the trial, March 14, 1968, Dr. Regan opined that plaintiff’s chances for total recovery were less than fifty percent. Dr. Regan ruled out the possibility of organic brain damage, referred to in the record as a chronic brain syndrome.
Dr. Regan was informed on cross-examination that at one time plaintiff was a heavy drinker and that he had suffered from prostatitis. It was defendant’s position that these problems could account for plaintiff’s symptoms. Even after rigorous cross-examination, Dr. Regan maintained his opinion that this was a case of traumatic neurosis caused by the accident of June 10, 1965. Dr. Regan admitted that it was possible, but contended that it was improbable, that plaintiff’s present mental difficulties were related to his earlier drinking problem, his prostatitis, or the anxiety related to the possible settlement or trial of this case.
In conrast to Dr. Fisher and Dr. Regan, Dr. Thomas Rafferty, psychiatrist of New Orleans, concluded that plaintiff’s psychiatric disability was not caused by the accident of June 10, 1965. He first examined plaintiff on January 25, 1967, at which time plaintiff complained of spinning in his head, and a backache. Plaintiff told Dr. Rafferty he was not depressed and Dr. Rafferty did not find him to be depressed. Dr. Rafferty concluded that plaintiff was exaggerating his condition and was probably malingering. Dr. Rafferty did not know that plaintiff was then under treatment by another psychiatrist and was then taking medication. On being informed of these facts, he stated that this did not change his opinion in any way. We are impressed by the fact that plaintiff was taking three different anti-depressant drugs when he first visited Dr. Rafferty, and that these medications possibly prevented Dr. Rafferty from making a proper diagnosis.
Dr. Rafferty saw a different picture on plaintiff’s second visit of April 17, 1967. *228 Plaintiff had a sad. expression, said he tired easily and was impotent. Plaintiff also complained of insomnia and a loss of memory. The patient “presented a clear cut picture of a severe depressive reaction.” It is noted that in the period between examinations, plaintiff had received about eighteen electroshock treatments, and was then scheduled for additional treatments.
Although Dr. Rafferty conceded that plaintiff was psychologically impaired, and agreed that electroshock treatment was required, he concluded that the automobile accident of June 10, 1965 was not the cause of this condition. He was of the opinion that something had happened in the interval between his first and second examinations. At his April examination, he was unable to find a cause for the depressive reaction. But while waiting to testify, he heard testimony concerning an incident which occurred between these two examinations. This incident was described by Mrs. Levier. Plaintiff had asked his 14 year old daughter to get a cup of coffee for him. When she complained that Daddy always wanted something, plaintiff cried and had to be ministered to and quieted down by his wife. Following this, plaintiff was taken on a hunting trip by his brother-in-law and another man. Plaintiff wouldn’t come out of the woods until almost daybreak the next morning. He was hospitalized later that day and his course of electroshock treatments started shortly thereafter.
This incident is referred to by defendant as a family quarrel or family fracas, and Dr. Rafferty relates plaintiff’s disability to this rather than to the June 10, 1965 automobile accident.
In addition to the medical evidence, both parties introduced lay testimony which added little to the medical testimony. Defendant attached much significance to the fact that one of defendant’s witnesses said that he laughed about plaintiff’s behavior in the courtroom. At trial, plaintiff didn’t know his lawyer, didn’t recognize the flag of the United States, etc. The trial judge stated that he attached little significance to the testimony which was specifically denied by plaintiff’s witness. The record amply supports this conclusion. The lay testimony by defendant would suggest that this plaintiff only complained to the psychiatrists and appeared normal at all other times. The medical testimony establishes that plaintiff could not have appeared normal at all times, certainly not while he was an out-patient undergoing electroshock treatments.
Dr. Rafferty’s opinion that plaintiff is a malingerer is based on three examinations made for evaluation purposes only. On the other hand, plaintiff’s two psychiatrists saw and treated him on many occasions' — Dr. Fisher on seven occasions, and Dr. Regan on more than fifty occasions.
The history of plaintiff’s injury, his continuous disability and treatment since the accident support the preponderance of testimony that his physical disability through April 19, 1966, and his psychoneurotic reaction, depressive reaction, which has been diagnosed since that time are related to the June 10, 1965 accident. The incident to which Dr. Rafferty would relate plaintiff’s admittedly disabling mental condition, pales in comparison to the serious injuries sustained in the accident.
That the trial judge was well aware of the care and restraint that must be exercised in cases such as this is reflected in his reasons for judgment, (Tr. 34) :
“Disability due to post traumatic neurosis or conversion reaction is recognized by the courts. When it is predicated upon such, the courts must proceed with utmost caution and exercise extreme care in view of the nebulous characteristics of such a condition. The evidence should be scrutinized carefully and every precaution should be taken to protect insurers against unjustified claims based on alleged mental conditions. On the other hand, the danger of denying recovery to a deserving claimant is equally as apparent and must be guarded against. Jackson v. International Paper Company, 163 *229 So.2d 362 ([La.App.] 1964), (and other cases therein cited).”
The trial judge properly stated and applied the applicable law. His finding that the plaintiff was disabled and that such disability was caused by the June 10, 1965 accident, is supported by the record.
The award of $12,000 for plaintiff’s disability, including pain and suffering, while low is not an abuse of the large discretion granted to the trial judge. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). The award of $4,335.61 in medical expenses is supported by the evidence.
No mention is made in the trial court’s opinion of plaintiff’s substantial loss of earnings. At trial, there were three plaintiffs. The trial judge allowed loss of earnings to this plaintiff’s fellow workers, each of whom lost only five months of work.
Plaintiff was earning $54.00 per week at the time of the accident. He has been unable to return to construction work since June 10, 1965. He did perform farm labor from July 8, 1966 until February 24, 1967.
Plaintiff has proved that he is entitled to an award for future loss of earnings. We are allowing recovery for a period of one year from the date judgment was granted by the trial court.
For loss of earnings, both past and future, plaintiff is entitled to $10,500.
The judgment of the trial court is amended so as to read:
It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff and against defendant, in the full sum of $26,835.61, together with legal interest thereon from date of judicial demand, until paid.
All costs of court are taxed to defendant.
Amended and affirmed.