LANDRY, Judge.
Cesco, Inc. (Cesco) and its workmen’s compensation insurer, Highlands Insurance Company (Highlands), appeal the judgment of the trial court awarding Cesco’s employee, Ven Straughter (Appellee), workmen’s compensation benefits for total permanent disability in the sum of $45.00 weekly, not exceeding 500 weeks. The occurrence of a disabling accident within the scope and during the course of Appellee’s employment is conceded. The sole question is that of continuing disability. Ap-pellee has answered the appeal praying for penalties and attorney’s fees denied by the trial court and for interest on past due compensation, together with interest on all sums awarded for medical expense. We reverse the finding of total permanent disability and remand this matter to the trial court for further proceedings.
At approximately 12:30 A. M., February 5, 1969, plaintiff, a 59 year old laborer, together with fellow employees, Lindell Martin and Enis Pritchard, was engaged in the task of cleaning an elevated tank, consisting in part of a series of metal tubes, on Cesco’s premises. The level at which Ap-pellee was working when injured is estimated at between three and five stories above ground. The cleaning process was accomplished by using a metal rod or reamer together with water furnished by high pressure hoses and certain mechanical equipment, the exact nature of which is not explained in the record. While so en *127 gaged, plaintiff and his co-workers were exposed to an admittedly toxic gas, either phosgene or chlorine, emitted from one of the tubes being cleaned. The record preponderates in favor of the conclusion that the gas was phosgene. Plaintiff was overcome to the extent he fell against some pipes and was assisted to ground level by his fellow employees. The incident was reported to a foreman who told plaintiff that plaintiff appeared to be all right, and for the crew to get some gas masks and resume the operation because the work had to be completed as soon as possible. All three workers experienced immediate eye irritation and began coughing. They resumed work using gas masks and at the end of their shift, approximately 7:30 A. M., all reported to Cesco’s infirmary where they were given medication for eye irritation.
At approximately 9:30 A. M., February 5, 1969, plaintiff consulted Dr. Roy Regan who hospitalized plaintiff on two occasions, and under whose care plaintiff remained until February 20, 1969. From February 21, 1969 to March 17, 1969, and from April 16, 1969 to April 30, 1969, plaintiff was under the care of Dr. Richard Moore. On two occasions, May 23, 1969 and an undisclosed later date, plaintiff was seen by Dr. David W. Walls, Internist. Dr. Thomas Campanella, Orthopedist, examined plaintiff on March 3, 4 and S, 1970.
Plaintiff was paid compensation from February 6, 1969 through August 8, 1969, on which latter date payments ceased upon receipt by defendants of a report from Dr. Walls to the effect plaintiff had recovered and was able to resume employment.
Appellants contend the trial court erred in awarding plaintiff benefits beyond February 20, 1969, and alternatively urge that the lower court erred in decreeing plaintiff disabled beyond November 6, 1970.
In substance, plaintiff testified he was assisted to ground level after having been overcome by gas and having fallen against some pipes. After reporting the incident to his foreman,.Mr. Roy, he was instructed to return to work, which he did. During the rest of the shift, plaintiff used a gas mask, but on several occasions was forced to return to the ground to replace the mask filters because gas was penetrating the mask. At the end of the shift, he sought medical aid at his employer’s infirmary and was given some eye drops. Later that morning, he contacted Dr. Regan because of eye irritation, continued coughing, vomiting and difficulty in breathing. A summation of plaintiff’s complaints is that since the accident, he has experienced a numbness of the lips, arms and left leg, hands and fingers, pain in the left leg and back, injury to his tail bone (coccyx), nervousness and irritability. He also explained that he has to take pills constantly for his nervous condition. In addition, plaintiff stated he has been unable to work since the accident and has not tried because he knows he cannot perform any work.
Lindell Martin corroborated, in most respects, plaintiff’s version of the accident. Following the incident, he reported to the infirmary at the end of his shift and was given medication for eye irritation. Martin stated he was hospitalized three days under oxygen, but recovered from the effects of his exposure. He also stated that since the accident, he noticed that plaintiff sits sideways and walks with a cane whereas plaintiff was perfectly well before the mishap.
Enis Pritchard’s testimony is that while he too was exposed to the gas, he did not require hospitalization and has suffered no ill effects therefrom.
Plaintiff’s wife, Lizzie Straughter, stated in essence that her husband was a well man before his accident. Since the accident, however, plaintiff has been irritable and short-tempered. She also stated that plaintiff complains of back pains, that he cannot sit down very well, and that he requires daily medication for his extremely nervous condition. Mrs. Straughter fur *128 ther testified that plaintiff is unable to do anything but lie on a foam padding which he places on a bench under a tree in the yard.
Dr. Roy Regan, General Surgeon, saw plaintiff on the morning of February 5, 1969. Plaintiff related a history of gas poisoning several hours previous. Plaintiff was suffering from mild conjunctivitis (irritation of the eyelids and eyeballs). Dr. Regan also noted plaintiff was coughing and had a chest rattle indicative of bronchitis. Dr. Regan prescribed some medication and allowed plaintiff to return home. Plaintiff returned that afternoon, and examination disclosed plaintiff was short of breath and had congestion in the lungs. Finding plaintiff worse, Dr. Regan hospitalized plaintiff and administered oxygen, antibiotics, eye drops, expectorant cough syrup and pain relievers. X-rays revealed marking of the lungs, the presence of some old scarring, fibrosis and the probability of superimposed interstitial pneumonitis, the latter being more prevalent in the right lung. Dr. Regan also found recent acute inflammation of the lungs, but no enlargement of the patient’s heart. Plaintiff’s condition was such that by February 7, 1969, plaintiff was free of pneumonitis on the left side. During his hospitalization, plaintiff complained of pain in the sacrococcygeal area. X-rays and visual examination of the area disclosed no sign of fracture or evidence of injury such as a bruise or swelling. Some evidence of a slight roughening of the distal extremity of the sacrum, just above the sacrococcygeal joint, was noted, however. By February 12, 1969, Dr. Regan considered plaintiff 99% recovered and discharged plaintiff on that date.
Dr. Regan saw plaintiff again in the hospital emergency room early in the night of February 13, 1969. At this time plaintiff was upset, anxious and in mild acute distress. Plaintiff complained of chest pains, pains in the epigastric area, pain in the upper abdomen and numbness of the lips and right leg. Dr. Regan concluded plaintiff was suffering primarily from anxiety with some exaggeration of symptoms. Although he felt there was nothing really wrong with plaintiff, Dr. Regan ordered plaintiff hospitalized. To relieve plaintiff’s symptoms, Dr. Regan prescribed pain relievers, tranquilizers and oxygen. Numerous tests of plaintiff’s heart, pancreas and gastro-intestinal tract proved negative. Dr. Regan did not associate plaintiff’s numbness with plaintiff’s exposure to phosgene gas. Plaintiff was discharged February 17, 1969, after plaintiff’s conjunctivitis and pneumonitis had cleared. On this date, Dr. Regan found no evidence of heart disease.
Dr. Regan also saw plaintiff in his office on February 20, 1969. Plaintiff complained of pain in the coccygeal area and also complained of numb lips. Dr. Regan noted that plaintiff was walking in a hunched over position and appeared to be mad, particularly mad at plaintiff’s foreman, Roy. On this occasion, Dr. Regan felt that plaintiff was physically well, but just appeared to be mad, angry and suffering from considerable anxiety. Dr. Regan also felt that plaintiff was exaggerating his symptoms.
In Dr. Regan’s opinion, phosgene does not have a direct effect upon the heart, and does not cause pericarditis or inflammation of the membrane which encloses the heart. He conceded that little is known about the effects of toxic gases, and only an extremely limited amount of medical literature is available on the subject of gases in general. He explained that from available information, phosgene and chlorine are primarily choking type gases in that they affect the respiratory tract, lungs, bronchi and trachea. Dr. Re-gan also noted that phosgene is more dangerous than chlorine because phosgene does not affect the nose, mouth and throat as chlorine does. Rather phosgene attacks the lungs and bronchi and causes more damage than chlorine because the person subjected to phosgene is exposed for a longer period before he becomes aware of *129 the effects. Chlorine, Dr. Regan explained, affects the eyes immediately; phosgene does not. Dr. Regan conceded that phosgene could indirectly affect the heart by virtue of the effect it has on the lungs, but he did not think such was the case with regard to plaintiff. In short, Dr. Regan was of the opinion that any heart condition plaintiff had following the gas exposure was not due to plaintiff’s accident, and moreover that plaintiff had recovered from any effect on his heart which may have resulted indirectly from the accident. Dr. Regan also noted that any remaining heart condition was the result of natural causes, namely, arteriosclerosis and not the accident. In Dr. Regan’s opinion, there was nothing physically wrong with plaintiff, and plaintiff was able to resume work.
Dr. David Wall, Cardiologist, examined plaintiff on May 23, 1969, and rendered a report thereon to Highlands under date of August 19, 1969. Apparently Highlands had advance notice of the contents of the report since it contends it ceased compensation payments on August 8, 1969, on the strength of Dr. Wall’s report. The report diagnoses plaintiff’s condition as probable arteriosclerotic heart disease with angina pectoris and recurring episodes of severe coronary insufficiency, diabetes and hypertension. The report concludes that Dr. Wall could not associate plaintiff’s heart condition with exposure to phosgene gas.
Dr. Wall testified he examined plaintiff on the date above indicated and found plaintiff complaining of a smothering feeling in the chest, numbness and back pains. He found plaintiff extremely apprehensive, and noted that plaintiff cried several times during the examination. Dr. Wall found it hard to take plaintiff’s history because plaintiff appeared to be afraid of saying something that was wrong. Part of Dr. Wall’s examination included a study of all of plaintiff’s hospital records. In addition, Dr. Wall conducted numerous tests, all of which proved negative of any disability resulting from gas exposure. Dr. Wall found evidence of arteriosclerotic heart disease, chest pains caused by angina pec-toris and high blood pressure, none of which conditions were attributable to plaintiff’s accident. Dr. Wall also noted plaintiff was extremely nervous, almost to the point of hysteria. In Dr. Wall’s opinion, plaintiff’s pneumonitis while in the hospital was caused'by gas inhalation. Dr. Wall explained that he conducted extensive research on all available medical material regarding gases and their effects and found nothing to substantiate a causal connection between phosgene poisoning and pericardi-tis. Dr. Wall acknowledged that repeated exposure to phosgene could have a cumulative effect, but was unable to say that phosgene could affect a person’s nervous system. Upon being shown medical literature stating that degenerative nerve changes could be produced as a residual of phosgene poisoning, Dr. Wall conceded plaintiff’s nervousness could be due to phosgene poisoning, but it was also possible this condition was due to some organic disorder. The tenor of his testimony, however, is that exposure to gas was not the cause of plaintiff’s present condition.
Dr. Richard M. Moore, who took specialized training in internal medicine and cardiology, testified by deposition taken November 6, 1970. He first saw plaintiff on February 21, 1969, at Lane Memorial Hospital. Plaintiff related a history of gas exposure and resultant hospitalization and complained of severe chest pains, wheezing and difficulty in walking. Plaintiff explained that he hurt his back. Dr. Moore hospitalized plaintiff and took electrocardiograms which disclosed the possibility of pericarditis. X-rays revealed plaintiff had a fractured coccyx. Dr. Moore conceded that available medical literature is of little help in determining whether phosgene poisoning can cause pericarditis or myocardi-tis, both of which conditions are related to the heart. Dr. Moore also noted that while plaintiff showed some improvement in that plaintiff’s back pains improved, plaintiff was a difficult case. In Dr. Moore’s opinion, it was odd that plaintiff *130 could have been well before the accident and start having all the troubles plaintiff experienced immediately thereafter. Dr. Moore found that plaintiff had interstitial pneumonitis and felt that plaintiff had pericarditis with some involvement of the heart itself. In Dr. Moore’s judgment, plaintiff had interstitial pneumonitis involving the entire lung and also the heart membrane which is in constant contact with the lung. This contact, according to Dr. Moore, affects the pericardium (the heart membrane) which in turn will affect the heart itself if the pericarditis lasts sufficiently long. On March 17, 1970, Dr. Moore discharged plaintiff with the diagnosis “Chest pain probably due to acute pericarditis secondary to gas inhalation. 2. back pain probably due to (1) ruptured disc, (2) fracture of the coccyx, (3) lum-bosacral strain. 3. Mild emphysema.” Plaintiff returned to Dr. Moore and was again hospitalized April 13, 1970. On April 30, 1970, Dr. Moore discharged plaintiff with the diagnosis “pericarditis and myocarditis probably due to toxic gases.” On plaintiff’s initial hospitalization Dr. Moore found evidence of a heart condition which disappeared after plaintiff’s second stay in the hospital. On this basis, Dr. Moore concluded that the heart condition was not due to aging but to gas exposure, otherwise the condition would have continued.
Dr. Moore also noted that plaintiff lost approximately 30 pounds and has in Dr. Moore’s words “become a nervous wreck.” Plaintiff, according to Dr. Moore, has peripheral neuritis affecting his hands to the extent plaintiff has no grip and cannot grasp or hold objects. It is Dr. Moore’s opinion that plaintiff is totally unable to do manual labor. Dr. Moore saw plaintiff March 21, April 8, April 16, May 12 and May 26, 1970. On the latter date, Dr. Moore found plaintiff suffering from extremely high blood pressure. In summary, Dr. Moore testified that plaintiff has fully recovered from all the effects of his accident except that plaintiff is suffering from peripheral neuritis and is also afflicted with extreme anxiety as a result of his condition. Dr. Moore believes that plaintiff’s neuritis is a degenerative effect of the gas poisoning. He based this opinion primarily upon medical treatises which state that phosgene causes degenerative nerve changes, but do not indicate how long such changes last or how long they take to become manifest. Dr. Moore placed considerable emphasis on the fact that plaintiff’s neuritis has progressed from initial complaints of numbness' i'n the lips only to present complaints of extreme numbness of the hands and fingers. Dr. Moore conceded that plaintiff’s present disability is due entirely to plaintiff’s nervous condition, and that so far as plaintiff’s heart and back are concerned, plaintiff could resume work. Dr. Moore was somewhat uncertain whether plaintiff’s condition as of November 6, 1970 was due to conversion hysteria or peripheral neuritis. In the six weeks preceding the taking of his testimony, Dr. Moore noted that the numbness in plaintiff’s hands and lips had worsened to the point that these bodily members could be pierced with a needle without plaintiff feeling any pain. He noted that plaintiff was an extremely cooperative patient. Dr. Moore strongly suggested and recommended that plaintiff be evaluated by a psychiatrist or neurologist because he was not entirely certain whether the condition is due to mental or physical causes. Dr. Moore did state that while he is not an expert in the field of psychiatry or neurology, he felt there was a correlation between plaintiff’s present condition and plaintiff’s exposure to gas.
Appellants’ chief complaint, predicated upon Powell v. Patterson Truck Lines, Inc., La.App., 228 So.2d 254, is that plaintiff has failed to establish his disability by that preponderance of evidence required by law. Relying upon Morris v. Kaiser Aluminum and Chemical Co., La.App., 228 So.2d 261, appellants urge that plaintiff has also failed to establish causal relationship between his continuing disability and the accident. In this regard, appel *131 lants note the record is devoid of expert testimony by a psychiatrist or neurologist to corroborate the finding of conversion hysteria found by Dr. Moore. Appellants also urge that since Dr. Moore is admittedly not an expert in either psychiatry or neurology, his testimony, standing alone, is insufficient to support a finding of total permanent disability due to conversion hysteria or peripheral neuritis.
■ Plaintiff,, however,, urges affirmation of his disability pursuant to the rule that in a compensation case, proof is not required as to the exact cause of disability, but that plaintiff only establish by a preponderance of evidence that causal relationship exists between his disability and the accident. In so contending, plaintiff relies upon Russell v. Employers Mutual Liability Ins. Co. of Wisconsin, 246 La. 1012, 169 So.2d 82.
The trial court felt that Dr. Moore’s testimony furnished reasonable probable cause that plaintiff’s disability resulted from phosgene gas poisoning. In so concluding, the lower court gave greater weight to Dr. Moore’s testimony on the ground Dr. Moore and Dr. Wall were of similar expertise, but that Dr. Moore had treated plaintiff over an extended period, whereas, Dr. Wall had seen plaintiff on two occasions for evaluation only. In addition, the trial court applied the rule of presumption of causal connection where a disabling condition follows an accident, as held in Bertrand v. Coal Operators Casualty Company, 253 La. 1115, 221 So.2d 816.
We believe appellant’s position well taken in view of the fact that alleged disability due to conversion hysteria or peripheral neuritis is closely akin to traumatic neurosis in that the nature of the disability is nebulous to say the least. It is well settled that alleged disability of a nebulous nature will be carefully scrutinized by the courts which must proceed cautiously in such cases. Boutte v. Mudd Separators, Inc., La.App., 236 So.2d 906; Romero v. Travelers Insurance Company, La.App., 198 So.2d 191.
The record is clear that Dr. Moore, the only medical authority who considers plaintiff presently disabled, is of the opinion that the continuing disability is solely the result of conversion hysteria or peripheral neuritis. While Dr. Moore causally relates plaintiff’s condition to the accident, it is significant that Dr. Moore is not a specialist in either the field of psychiatry or neurology. We are of the view that his testimony, standing alone except for the support of lay evidence, is insufficient to support a claim for disability predicated upon conversion hysteria or peripheral neuritis.
Much discretion is vested in the courts in disposing of claims for workmen’s compensation benefits. The applicable statute itself requires a liberal interpretation in favor of the injured employee. With this principle in mind, we deem that the ends of justice will best be served by a remand of this matter to the trial court thereby affording all concerned the opportunity for psychiatric and neurological evaluation of plaintiff’s condition. Receipt of such evidence will enable proper consideration and disposition to be made by the trial court of the question whether plaintiff’s hysterical conversion or peripheral neuritis is causally related to the accident.
We note Dr. Moore’s testimony to the effect that as of November 6, 1970, plaintiff was completely well and able to resume his former employment except for disability resulting from conversion hysteria or peripheral neuritis. Considering this circumstance, the trial court is instructed to award plaintiff compensation from the date of the accident until November 6, 1970, in the event that court concludes on remand that plaintiff’s conversion hysteria or peripheral neuritis is not causally related to the accident in question. Should the trial court find such a causal relation, it is instructed to award plaintiff compensation benefits for total permanent disability, not to exceed 500 weeks.
We find no merit in plaintiff’s claim for attorney’s fees and penalties. *132 Predicated on Dr. Wall’s report dated August 19, 1969, which showed plaintiff was fully recovered and able to resume work, Highland’s refusal to continue compensation payments was neither arbitrary nor capricious. For the benefit of the trial court, we note, however, that a claimant is entitled to interest on past due compensation benefits.
The judgment of the trial court is reversed and set aside, and this .matter remanded to the trial court for further proceedings consistent with the views herein expressed, all costs of this appeal to be paid by plaintiff, Ven Straughter.
Reversed and remanded with instructions.